1
2
3
4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

5

6

CHRISTOPHER WILLIAM HARRIS,

7
                              Plaintiff,

8        v.

9    JOSE PEREZ,

                              Defendants.

10

Case No. 2:21-cv-01335-BHS-TLF

REPORT AND
RECOMMENDATION

Noted for ___October 20, 2023___

11       This matter is before the Court on defendant's filing of a motion for summary

12   judgment and, alternatively, to dismiss pursuant to Federal Rule of Civil Procedure

13   (FRCP) 37(d) and Local Civil Rule (LCR) 11(c) for plaintiff's failure to participate in

14   discovery. Dkt. 71. Plaintiff has brought suit under 42 U.S.C. § 1983 against defendant

15   Jose Perez, a Snohomish County Sheriff's Deputy, for the alleged use of excessive

16   force during the course of plaintiff's arrest on November 28, 2020.[1] This matter has

17   been referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v.*

18   *Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4). For the

19   reasons set forth below, the Court should grant in part and deny in part defendant's

20   motion for summary judgment (Dkt. 71) and deny defendant's motion to dismiss

21   pursuant to FRCP 37(d) and LCR 11(c) (Dkt. 71).

22

23

24

[1] Plaintiff originally named several other defendants but all defendants except Jose Perez were previously dismissed from the case. *See* Dkts. 57, 58, 66.

25

REPORT AND RECOMMENDATION - 1

1

## BACKGROUND

In his amended complaint, plaintiff alleges that defendant Perez used excessive

force during plaintiff's arrest on November 28, 2020, in violation of the Fourth

Amendment. Dkt. 58. Plaintiff alleges the following:

> On 11/28/2020 around 11:30am & 12 none [sic] a joint operation between the Tulalip Police Dept. & Snohomish County Sheriff's Dept. during my arrest which took place on the 37- acre wet land restoration project in Marysville along side the Ebey Slough. Without warning or identifying himself as a police officer Deputy Jose Perez blind sided me with a massive punch to the right side of my eye which split my right eye open and knocked me to the ground. Deputy Jose Perez then jumped on top of me and began to violently punch me repeatedly in the face and my head until I lost consciousness[.] After this point I didn't remember anything the cop did to me next due to being knocked unconscious[.] My assault caused by Jose Perez was captured on video by a police drone, after I was knocked unconscious, I was not resisting, a helpless victim at this point[.] Deputy Perez then rolled me on my side and intentionally started to viciously knee me in the side of my neck and the back of my upper spine. I was then taken to the hospital (Providence Medical Center Everett WA 98201) where I was treated for a broken left leg and due to the vis[i]ble head trauma I was subjected to the medical staff deemed it medically ne[cessary] and gave me a CAT-scan.

*Id.*

Plaintiff alleges that as a result of these events, he incurred:

> 1) A vis[i]ble scar under my chin & visible scar on my right temple from the violent punches 2) a broken left leg 3) impaired vision in my right eye from the blunt force impact of 5 powerful punches 4) my neck and upper spine are in constant pain from the officers attempt to paralize [sic] me from his kneeing me in the neck 5) perm[anent] nerve damage from the deep gash from the cops intentional punch with [sic] split my temple open.

As relief, plaintiff seeks monetary damages. *Id.*

Defendant now moves for summary judgment arguing that plaintiff fails to

establish a constitutional violation and that defendant further is entitled to qualified

immunity as his actions did not violate clearly established law. Dkt. 71. Additionally,

defendant argues that the action should be dismissed pursuant to FRCP 37(d) and LCR

11(c) due to plaintiff's failure to participate in discovery. *Id.*

//

1

## LEGAL STANDARD

2          Summary judgment is supported "if the pleadings, the discovery and disclosure

3   materials on file, and any affidavits show that there is no genuine issue as to any

4   material fact and that the movant is entitled to judgment as a matter of law." FRCP

5   56(c). The moving party bears the initial burden to demonstrate the absence of a

6   genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323

7   (1986). A genuine dispute concerning a material fact is presented when there is

8   sufficient evidence for a reasonable jury to return a verdict for the non-moving party.

9   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which

10  is "relevant to an element of a claim or defense and whose existence might affect the

11  outcome of the suit," and the materiality of which is "determined by the substantive law

12  governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d

13  626, 630 (9th Cir. 1987).

14         When the Court considers a motion for summary judgment, "[t]he evidence of the

15  non-movant is to be believed, and all justifiable inferences are to be drawn in [their]

16  favor." *Anderson*, 477 U.S. at 255. Yet the Court is not allowed to weigh evidence or

17  decide credibility. *Id.* at 255. If the moving party meets their initial burden, an adverse

18  party may not rest upon the mere allegations or denials of his pleading; his or her

19  response, by affidavits or as otherwise provided in FRCP 56, must set forth specific

20  facts showing there is a genuine issue for trial. FRCP 56(e)(2). The Court may not

21  disregard evidence solely based on its self-serving nature. *Nigro v. Sears, Roebuck &*

22  *Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

23

24

25

In response to the motion for summary judgment, the nonmoving party is required to present specific facts, and cannot rely on conclusory allegations. *Hansen v. U.S.,* 7 F.3d 137, 138 (9th Cir. 1993). The court must determine whether the specific facts that are presented by the non-moving party, considered along with undisputed context and background facts, would show that a rational or reasonable jury might return a verdict in the non-moving party's favor based on that evidence. *Emeldi v. University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the conduct complained of was committed by a person acting under color of state law, and (b) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *See Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

Unless plaintiff makes a two-part showing, qualified immunity shields government officials from liability. The plaintiff must show both: the official(s) violated a federal statutory or constitutional right, and at the time of the alleged act or failure to act there was clearly established law that defined the contours of the federal right objectively putting the official(s) on notice – i.e., any reasonable official would understand that what they are doing is unlawful. *Escondido v. Emmons*, 139 S.Ct. 500 (2019); *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018).

When qualified immunity is reviewed in the context of a defense motion for summary judgment, the evidence must be considered in the light most favorable to the

plaintiff with respect to central facts. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). If there is a genuine issue of material fact concerning both: (1) Whether it would be clear to a reasonable officer that their conduct was unlawful under the circumstances they confronted, and (2) Whether the defendant's conduct violated a constitutional right, then summary judgment granting qualified immunity is not appropriate. *Bonivert v. City of Clarkston*, 883 F.3d 865, 871-72 (9th Cir. 2018).

To determine whether there was clearly established law, the Court has stated, "[w]hile there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate"; and the Court has also observed, "there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S.Ct. at 590. A clearly established right exists if "controlling authority or a robust consensus of cases of persuasive authority" have held, on facts that are close or analogous to the current case, that such a right exists. *Hines v. Youseff*, 914 F.3d 1218, 1229-30 (9th Cir. 2019).

In some contexts, there may be a general constitutional rule that has been identified in court decisions – and it may apply with such obvious clarity to the specific conduct of a defendant, that qualified immunity will not apply even though existing case law did not describe the specific factual scenario in the current situation. *United States v. Lanier*, 520 U.S. 259, 271 (1997); *Bonivert*, 883 F.3d at 872-73. If qualified immunity operated as a shield for all conduct that was not specifically addressed in existing case law at the time of the event in question, then officials would not ever be held accountable for unprecedented constitutional violations that would appear obvious.

1  *Hope v. Pelzer*, 536 U.S. 730, 740-42 (2002) (finding that a correctional officer's act of

2  handcuffing an inmate to a hitching post in a painful position under dangerous and

3  degrading circumstances was "antithetical to human dignity" and so obviously wanton,

4  painful and cruel under the Eighth Amendment that the officer had fair notice that this

5  was unlawful under existing legal precedent).

6  <u>DISCUSSION</u>

7  A.    Motion for Summary Judgment

8      1.    Legal Standard

9      In the Ninth Circuit, courts "analyze all claims of excessive force that arise during

10  or before arrest under the Fourth Amendment's reasonableness standard[.]" *Coles v.*

11  *Eagle*, 704 F.3d 624, 627 (9th Cir. 2012) (citing *Graham v. Connor*, 490 U.S. 386

12  (1989)). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one:

13  the question is whether the officers' actions are 'objectively reasonable' in light of the

14  facts and circumstances confronting them, without regard to their underlying intent or

15  motivation." *Graham*, 490 U.S. at 397.

16      "The 'reasonableness' of a particular use of force must be judged from the

17  perspective of a reasonable officer on the scene, rather than with 20/20 vision in

18  hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "Not every push or

19  shove, even if it may later seem unnecessary in the peace of a judge's chambers

20  violates the Fourth Amendment." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th

21  Cir. 2001) (citing *Graham*, 490 U.S. at 396). "The calculus of reasonableness must

22  embody allowance for the fact that police officers are often forced to make split-second

23

24

25

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

To assess "objective reasonableness," and whether a Fourth Amendment violation has occurred, the district court considers: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (internal citations and quotation marks omitted). In doing so, the district court also "take[s] into account the totality of the circumstances, including the 'type and amount of force inflicted,' 'the severity of injuries,' 'the severity of the crime at issue,' 'whether the suspect poses an immediate threat to the safety of the officers or others,' and 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023) (quoting *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) (quotations omitted)).

This Court may also consider "the availability of less intrusive alternatives to the force employed and whether warnings were given." *Id*. Whether the suspect poses an immediate threat is "the most important single element." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quotation omitted).

2.     Evidence

a)     Defendant's Evidence

In support of the motion for summary judgment, defendant submits the declaration of defendant Perez (Dkt. 72), the declaration of Snohomish County Deputy

1   Prosecuting Attorney Christopher Lee (Dkt. 73), a copy of the drone video footage of

2   plaintiff's flight and arrest on November 28, 2020 (Dkts. 73, Ex. A, 75), a copy of the

3   body-worn camera footage of plaintiff's post-arrest interview with a Tulalip Police Officer

4   as well as a transcript of that footage (Dkts. 73, Ex. B & C, 75), a copy of plaintiff's

5   Emergency Department Encounter at Providence Medical Center on November 28,

6   2020 (Dkt. 73, Ex. D), and a copy of plaintiff's CorEMR records from Snohomish County

7   Jail (Dkt. 73, Ex. E).

8           In his declaration, defendant Perez states that on November 28, 2020, at

9   approximately 2:01 PM, he responded to a request for assistance from the Tulalip

10  Police Department to the Snohomish County Sheriff's Office to contain a male suspect,

11  who he later learned is the plaintiff in this action, who was fleeing on foot from a

12  burglary in progress located in Tulalip, Snohomish County, Washington. Dkt. 72 (Perez

13  Decl.) ¶3. Defendant Perez states that the dispatcher informed him that Tulalip Police

14  Officers advised him that they had probable cause to arrest the suspect for Burglary 2nd

15  degree. *Id.* He states that dispatch further informed him that a Tulalip Police Officer had

16  chased after plaintiff, and in the process of trying to evade the Police, plaintiff went

17  through stickery bushes and then jumped off a ten-foot embankment into a swamp. *Id.*

18  at ¶4. He states dispatch also informed him that a drone was tracking the plaintiff's flight

19  from police through the swamp, the drone tracked and recorded video of the plaintiff's

20  progress through the swamp for about 45 minutes, and located him in a heavily wooded

21  area near 6000 29th Dr NE Marysville, WA. *Id.* at ¶5.

22          Defendant Perez states he entered the wooded area near 6000 29th Dr NE,

23  Marysville, WA, which consisted of thick blackberry bushes with thorns, with two other

24

25

officers to apprehend plaintiff. *Id.* at ¶6. He states he announced his presence to plaintiff by saying he was the police, directing him to get on the ground, and that plaintiff was under arrest. *Id.* at ¶7. He states that prior to contacting plaintiff he could see that plaintiff's face and arms were scratched. *Id.* at ¶8.

He states he approached plaintiff and took him to the ground in a manner consistent with his training and experience by wrapping his arms around plaintiff and bringing him to the ground. *Id.* Defendant Perez states that while plaintiff was on his stomach on the ground, plaintiff stuck both of his hands into his waistband underneath his body and refused to comply with defendant Perez's directives to show his hands. *Id.* at ¶9.

Perez states he attempted to grab onto one of plaintiff's arms, but felt his muscles tense up, actively trying to resist defendant Perez from gaining control of his arms. *Id.* Defendant Perez states he attempted to pull on plaintiff's arm to gain control but was unable to overpower the strength of both plaintiff's hands tucked into his waistband underneath his body. *Id.* at ¶10. He states that because of the knowledge he received from dispatch, that plaintiff had just broken into a vehicle, attempted to burglarize a shop, and was fleeing from a peace officer, he was concerned plaintiff may have been carrying sharp objects or other weapons. *Id.* at ¶11.

Defendant Perez states that prior to this incident, he had been involved in approximately 20 burglary cases in a law enforcement capacity and that since this incident, he has been involved in approximately 50 total burglary cases in a law enforcement capacity to date. *Id.* at ¶12. He states that based on his training and

experience, subjects committing these types of crimes typically carry sharp objects, guns, and knives. *Id.* at ¶13.

Perez states in the declaration that for his own and plaintiff's safety, consistent with his training and experience, he delivered closed hand compliance strikes to plaintiff's right flank and upper right arm area to gain control of plaintiff's arms to ensure plaintiff had no access to potential weapons. *Id.* at ¶14. He states that these types of compliance strikes are designed to cause temporary pain while minimizing the risk of lasting injury. *Id.* Defendant Perez states that he then felt plaintiff's right arm loosen and was able to gain control of plaintiff's right arm, placing it behind his back. *Id.* at ¶15.

Defendant Perez states that plaintiff continued to resist him by keeping his left arm stuck in his waistband under his stomach. *Id.* at ¶15. He states that using both of his hands to secure plaintiff's right arm behind plaintiff's back, consistent with his training and experience, he then delivered knee strikes to the plaintiff's upper right arm area to gain compliance and control of plaintiff's left arm. *Id.* at ¶16. He states that knee strikes in this manner are also designed to cause temporary pain to gain compliance but not lasting injury. *Id.* at ¶16.

Perez states that plaintiff ceased resisting after several knee strikes, and he was able to gain control of plaintiff's left arm so his hands could be cuffed behind his back. *Id.* He states that as soon as he had plaintiff's hands secured, he ceased the use of all compliance strikes. *Id.*

Defendant Perez states that he and two other officers then escorted plaintiff out of the wooded area. *Id.* at ¶19. He states that upon arriving at 6000 29th Dr NE, Marysville, WA, he released plaintiff to the custody of Tulalip Police officers. *Id.* He

states that at no point during the arrest did he observe plaintiff fall unconscious but, rather, plaintiff was awake and talking the entire time. *Id.* at ¶17. He states that he employed no additional compliance tactics to effectuate the arrest. *Id.* at ¶18.

The drone video of plaintiff's flight and arrest (which does not have audio) shows plaintiff proceeding through a wooded area. Dkts. 73, Ex. A, 75. It shows defendant Perez approaching plaintiff, moving quickly coming from around a tree. *Id.* -- time stamp 9:36. Plaintiff stops when he sees defendant Perez and defendant Perez then grabs plaintiff by the shoulder and upper back and pushes him to the ground. *Id.* -- time stamp 9:36-38. Approximately one second elapses between the time the video shows plaintiff has noticed defendant Perez and stops, and the time defendant Perez has started pushing plaintiff to the ground. *Id.*

The video further shows defendant Perez is situated with his body partly on top of plaintiff's body; it appears Perez's hand or fist is hitting the upper right side of plaintiff's body three times. *Id.* -- time stamp 9:39-46. However, it is unclear exactly what part of plaintiff's body – shoulder, back, neck, or head – is being hit. *Id.* It is also unclear where plaintiff's right arm is located during this time; defendant Perez's body is blocking the view of the camera. *Id.* The video then shows plaintiff's right hand behind his back. *Id.* -- time stamp 9:45-46. It shows defendant Perez grasping and holding plaintiff's right hand with his left hand and defendant Perez moving his body around until he is kneeling on the upper right side of plaintiff's body. *Id.*

The video then shows defendant Perez grasping and holding plaintiff's left arm with his right hand. *Id.* -- time stamp 9:48-50. Initially it appears that plaintiff's left arm is underneath plaintiff's body. *Id.* The video shows defendant Perez's right knee is striking

plaintiff on the upper right side of his body three times. *Id.* -- time stamp 9:48-53. It is

unclear exactly where defendant Perez's knee is striking plaintiff – potentially the blows

are landing in the shoulder, neck, or upper back area. *Id.* After the second strike, it

appears defendant Perez pulls plaintiff's hand out from under his body and after the

third strike he pulls plaintiff's hand behind his back. *Id.* The video then shows defendant

Perez kneeling with one knee on plaintiff's upper back, holding plaintiff's hands behind

his back while another officer places handcuffs on plaintiff. *Id.* -- time stamp 9:50-10:06.

The video then shows defendant Perez turn plaintiff on his right side and, with the

assistance of another officer, help plaintiff to sit and then stand up. *Id.* -- time stamp

10:06-23.

        Bodycam video evidence of plaintiff's post-arrest interview shows that plaintiff

was Mirandized by Officer P. Powers. Dkt. 73 (Lee Decl.), Ex. B -- time stamp 00:20,

Ex. C at pg. 2, ln. 19-25. Plaintiff complained of pain in his left leg but stated that he

"already had a fracture from about a week ago." *Id.* -- time stamp 4:47-5:08; *Id.*, Ex. C at

pgs. 9-10, ln. 21-25. Plaintiff also mentioned to Officer Powers that the scratches on his

face were "from the last 20 feet of sticker bushes." *Id.*, Ex. B -- time stamp 6:27-6:33;

*Id.*, Ex. C at pg. 11, ln. 15-16. Plaintiff was then evaluated by Emergency Medical

Services, who checked plaintiff for injuries. *Id.*, Ex. B -- time stamp 6:55.

        Plaintiff was then transported to Providence Hospital for a medical evaluation

prior to his booking. *Id.*, Ex. B at time stamp 13:27-14:59. The Providence Emergency

Room records on November 28, 2020, reflect that plaintiff reported ankle pain and left

mid leg pain. *Id.*, Ex. D at 1. The records also indicate "possible closed head injury" and

that plaintiff reported a "mild headache." *Id.*

Emergency room records also indicate plaintiff was seen eight days prior to his arrest after being struck by a car and sustaining a midshaft fibular fracture. *Id.* The records reflect plaintiff was noted to have abrasions all over his body from running through bushes but no lacerations required repair at the emergency room on November 28, 2020. *Id.*

The records reflect that plaintiff was evaluated for a possible closed head injury and was given a CT scan of his head and cervical spine on November 28, 2020, in the emergency room. *Id.* at 1, 10. The November 28, 2020, CT scan of plaintiff's head showed no evidence of fracture or calvarial defect and the impression was a "normal head CT." *Id.* at 10. The CT scan of Plaintiff's cervical spine from the same day reflects an impression of "[n]o acute cervical spine abnormalities." *Id.* at 11.

The records also reflect that plaintiff was also given a CT scan of his head on November 20, 2020, after he was struck by a car as a pedestrian and reflects an impression of "[n]o acute intracranial abnormalities." *Id.* at 6-7. Plaintiff was medically cleared for jail and transferred to the Snohomish County Jail. *Id.* at 12-13. The records from Snohomish County Jail reflect that plaintiff reported during his jail intake interview on November 28, 2020, that his leg was broken from "a week or so ago." *Id.*, Ex. E at 14.

> b)   Plaintiff's Evidence

In his amended complaint plaintiff alleges "[w]ithout warning or identifying himself as a police officer Deputy Jose Perez blind sided me with a massive punch to the right side of my eye which split my right eye open and knocked me to the ground. Deputy Jose Perez then jumped on top of me and began to violently punch me repeatedly in the

face and my head until I lost consciousness[.] After this point I didn't remember anything the cop did to me next due to being knocked unconscious[.]" Dkt. 58. Plaintiff states, "after I was knocked unconscious, I was not resisting, a helpless victim at this point[.] Deputy Perez then rolled me on my side and intentionally started to viciously knee me in the side of my neck and the back of my upper spine." *Id.*

Plaintiff states, he was "taken to the hospital [...] where I was treated for a broken left leg and due to the vis[i]ble head trauma I was subjected to the medical staff deemed it medically ne[cessary] and gave me a CAT-scan." *Id.* Plaintiff alleges that as a result of these events, he incurred: 1) A vis[i]ble scar under my chin & visible scar on my right temple from the violent punches 2) a broken left leg 3) impaired vision in my right eye from the blunt force impact of 5 powerful punches 4) my neck and upper spine are in constant pain from the officers attempt to paralize [sic] me from his kneeing me in the neck 5) perm[anent] nerve damage from the deep gash from the cops intentional punch with [sic] split my temple open.[2] *Id.*

Plaintiff's declaration in support of the amended complaint asserts defendant Perez punched him in the right eye/temple knocking him to the ground. Dkt. 59. He asserts the "deputy then jumps on top of me, raises his fist above his head to cause the

---

[2] The amended complaint is unverified – it does not contain a sworn statement declaring under penalty of perjury, that the allegations are true and correct pursuant to 28 U.S.C. § 1746. As such, the complaint itself is not evidence in opposing defendant's motion for summary judgment. *See Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir.1985) (a verified complaint may be used as an opposing affidavit under Rule 56 to the extent it expresses personal knowledge of admissible facts but an unverified complaint is insufficient to counter a summary judgment motion supported by affidavits); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (the nonmoving party cannot "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."); FRCP 56(c), (e). Yet plaintiff has provided other statements in the record (cited in this report and recommendation) that are sworn to under penalty of perjury and may be considered in the context of defendant's motion for summary judgment.

1    most damage to my face and head. He then rolls me over on my side exposing my

2    spine and targeting my spine and neck with vicious knees to my neck, spine and

3    vertebre [sic]." *Id.* He argues defendant Perez did not identify himself and "without

4    warning blindsided and punch in the right side of his eye/temple knocking me to the

5    ground[.]" *Id.* He alleges deputy Perez could have simply ordered him to the ground with

6    his taser but instead punched him in the face and head and continued his "assault on a

7    helpless victim with intentional and vicious knees to my neck and upper spinal area

8    which could have easily killed me or paralyzed [sic] me." *Id.*

9         In other statements submitted in the record sworn under penalty of perjury,

10   plaintiff states that during his arrest he was punched multiple times in the head and face

11   and was rendered unconscious by these punches. Dkt. 29, 32, 38, 41. He states he was

12   unconscious and not resisting while he was on his stomach and that he was kneed in

13   the neck and back. Dkt. 38. He states he was left with a broken leg, unbearable pain in

14   his neck and spine, and problems with his vision in his right eye. Dkt. 29.[3]

15        Plaintiff also submits a response to defendant's motion which consists of his own

16   statements sworn to under penalty of perjury. Dkt. 79. In his response plaintiff states, in

17   relevant part, that he ran away because he was scared, not because he was committing

18   burglary. *Id.* He claims he was only on the premises to sleep because he was homeless

19   and that he ran away from the individuals on the premises who were yelling and

20   attempting to grab him. *Id.* He claims all charges connected to the incident were

21

22   [3] Under Federal Rule of Civil Procedure 56(c)(3), in the context of a motion for summary
     judgment, "[t]he court need consider only the cited materials, but it may consider other materials
23   in the record." The Court notes that the Ninth Circuit has directed district courts to "construe
     liberally motion papers and pleadings filed by *pro se* inmates and [ ] avoid applying summary
24   judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

25

dismissed. *Id.* Plaintiff claims he was unaware he was being surrounded by police -- but that the police were aware of where he was based on the drone camera. *Id.*

Plaintiff contends defendant Perez could have pulled out his non-lethal taser and made a "clean non-violent arrest" by pointing the taser at him and ordering him to the ground. *Id.* He states instead defendant Perez "choose [sic] to blind side me and tackle me to the ground like I was a receiver playing football, then switch to some forceful ground and pounds like I was his opponent in the UFC octagone, then he decided to step the violence up a notch with vicious strikes to my neck and back of my spine with his knee like it became some fight to the death in mid evil times." *Id.* Plaintiff states "I was a cuffed and a helpless victim and he was completely in the wrong for choosing to go that route making his arrest." *Id.* Plaintiff states defendant Perez's strikes were not "compliance strikes" but were intended to cause as much pain as he could. *Id.*

3.    Analysis

Plaintiff contends defendant Perez used excessive force in violation of the Fourth Amendment by (1) punching plaintiff in the right eye/temple without warning causing plaintiff to fall to the ground, or tackling plaintiff to the ground without warning and (2) employing closed-fist and knee strikes to plaintiff's body while he was lying on the ground. Defendant Perez argues he is entitled to summary judgment because his actions did not violate plaintiff's Fourth Amendment rights and alternatively that he is entitled to qualified immunity as his actions did not violate clearly established law.

For the reasons below, the Court recommends defendant Perez should be entitled to qualified immunity, and summary judgment -- on plaintiff's claims with respect

to the initial takedown to the ground. Plaintiff fails to show that defendant Perez's actions violated a clearly established right.

But, the Court should deny summary judgment and find defendant is not entitled to qualified immunity with respect to defendant's use of force in employing what appear to be closed-fist punches and knee strikes to areas of plaintiff's anatomy when plaintiff was on the ground.

a)    Initial Takedown

The Court first analyzes defendant Perez's initial takedown of plaintiff to the ground. With respect to the type and amount of force used, the video reflects that defendant Perez was moving quickly, though not at a full sprint, when he came around a tree and encountered plaintiff. It shows defendant Perez place his hands on plaintiff's shoulder and upper back and push him to the ground.

Plaintiff describes this as a "tackle" in his response to defendant's motion but the Court notes that the word "tackle" is subject to interpretation. For example, tackle in professional soccer is different from a tackle in rugby, and those tackles would be different from a tackle in American professional pro football. It is unclear from the video whether defendant Perez's body is fully or directly on top of plaintiff, although defendant Perez does partly fall/climb on top of plaintiff once plaintiff is on the ground. Although plaintiff also alleges in his declaration in support of his amended complaint that defendant Perez punched him in the head causing him to fall to the ground, the video evidence would not seem to support this assertion. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The Court also notes that the video evidence shows defendant Perez pushed plaintiff to the ground in a wooded area, not, for instance, on an unyielding surface such as pavement.

With respect to the severity of injuries, although plaintiff alleges in his declaration in support of his amended complaint that defendant Perez punched him in the head causing him to fall to the ground, as noted above this would appear to be unsupported by the video evidence.

Thus, the evidence indicates that the use of force at this stage was relatively minor. *Compare Trevino v. City of Bakersfield*, No. 1:14-CV-001873-JLT, 2016 WL 1090307, at *3, 5 (E.D. Cal. Mar. 21, 2016) ("relatively minor" force used where officer sprinted towards plaintiff and knocked him into grass, because plaintiff did not claim he was injured in the area where officer pushed him) *with Santos v. Gates*, 287 F.3d 846, 853–54 (9th Cir. 2002) (finding "take-down" by officers was "quite severe" use of force, because consequences of resulting injuries "endured for a significant period of time") *and Gomez v. City of Vacaville*, 483 F. Supp. 3d 850, 863 (E.D. Cal. 2020) ("Though a very strong push or shove is not necessarily a significant intrusion in every situation, here [plaintiff] hit the asphalt, and the effect the push had on his body in the moment and the resulting injuries suggest the quantum of force used by [defendant] was significant."); *and see Jackson*, 268 F.3d at 651 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." (citing *Graham*, 490 U.S. at 396)).

1    With respect to the crime at issue, the evidence shows that defendant Perez was

2 informed that he had probable cause to arrest plaintiff for second degree burglary,

3 which is a class B felony. *See* RCW § 9A.52.030. Also, defendant Perez had been

4 informed that plaintiff had just broken into a vehicle, attempted to burglarize a shop, and

5 was fleeing from a peace officer. Defendant's evidence shows that defendant Perez

6 was concerned plaintiff may have been carrying sharp objects or other weapons.

7 Defendant Perez presented evidence that based on his training and experience,

8 subjects committing the types of crimes such as burglary, typically carry sharp objects,

9 guns, and knives.[4]

10    Thus, allegations of the crime in progress — considering what defendant Perez

11 knew of it — would likely fall farther on the spectrum toward severe than, for instance,

12 misdemeanor trespass, although it clearly does not reach the highest level of severity.

13 *See Trevino*, 2016 WL 1090307, at *5.

14    With respect to whether plaintiff posed an immediate threat to the officer or

15 others, defendant Perez presents unrebutted evidence that he was operating based

16 upon information that plaintiff had just broken into a vehicle, attempted to burglarize a

17 shop, and was fleeing from a peace officer and that defendant Perez was concerned

18 plaintiff may have been carrying sharp objects or other weapons as, based on his

19 training and experience, subjects committing the types of crimes such as burglary,

20 typically carry sharp objects, guns, and knives. While it appears ultimately that plaintiff

21 _____

22 [4] Plaintiff denies committing burglary and contends he was only on the premises to sleep because he was homeless – stating that he only ran away from the individuals on the premises who were yelling and attempting to grab him. However, the reasonableness inquiry focuses on

23 whether the officer's actions are objectively reasonable *in light of the facts and circumstances confronting them*. Plaintiff does not dispute defendant Perez's evidence regarding the facts and

24 circumstances of the crime as Perez was aware of them when he encountered plaintiff.

25

was not carrying any weapons or sharp objects, there is no evidence defendant Perez was aware of this or should have been aware of this at the time. *See Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 863 (D.N.M. 2020) ("although officers discovered ultimately that plaintiff [who was suspected of committing a felony and initially fled from officers] was unarmed, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" (quoting *Graham*, 490 U.S. at 396)).

With respect to resisting arrest or attempting to evade arrest by flight, here, the evidence shows defendant Perez had been told that plaintiff had fled from police officers and in the process leapt off a ten-foot embankment into the marshy, wooded area where defendant Perez ultimately encountered him.

With respect to whether warnings were given, the Court notes that pre-force "warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001). Here, defendant Perez presents evidence that he announced his presence to plaintiff by saying he was the police, directing plaintiff to get on the ground, and that plaintiff was under arrest. Plaintiff, in opposing the motion, states that defendant Perez chose to "blind side" him and "tackle" him to the ground.

Construing plaintiff's allegations liberally, the Court understands plaintiff to be saying that defendant Perez did not give plaintiff a warning prior to pushing him to the ground. Accordingly, interpreting facts in the light most favorable to plaintiff, the Court

assumes for purposes of summary judgment, that defendant Perez failed to issue a

warning prior to encountering plaintiff and pushing him to the ground.

With respect to the availability of alternative methods of capturing or subduing a

suspect, plaintiff argues defendant Perez could have pointed a taser at plaintiff and

ordered plaintiff to the ground. But police "need not employ the least intrusive means

available; they need only act within the range of reasonable conduct." *S.R. Nehad v.*

*Browder*, 929 F.3d 1125, 1138 (9th Cir. 2019) (citing *Glenn*, 673 F.3d at 876 and *Scott*,

39 F.3d at 915). The Court notes that the tasers have been found to constitute an

intermediate, significant level of force, capable of causing significant pain. *See Bryan v.*

*MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (the tasered person "experiences an

excruciating pain that radiates throughout the body."). Thus, in order for plaintiff's

proposed alternative to constitute a lesser use of force than that actually employed

requires the Court to speculate that plaintiff would have complied with the instruction,

and that defendant Perez would not have had to use the taser. Had plaintiff not

complied, defendant Perez would likely have been in the position of having to employ

the taser, which would potentially have constituted an even greater level of force than

was employed in pushing plaintiff to the ground.

Plaintiff points to no clearly established law, nor is the Court aware of any,

establishing that the Fourth Amendment would be violated where a defendant pushes a

plaintiff to the ground in a wooded, marshy area without issuing a warning where

plaintiff is suspected of second-degree burglary (a felony) and is fleeing law

enforcement, there is unrebutted evidence that defendant did not know whether or not

plaintiff was carrying a weapon and that in defendant's training and experience

individuals engaged in burglary often carried sharp objects, guns, and knives, and there is no evidence of significant injury resulting from the push to the ground.[5]

In *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001), the Ninth Circuit addressed the issue of warnings in excessive force cases. The Court stated, in relevant part, "[w]e do not hold, however, that warnings are required whenever less than deadly force is employed. Rather, we simply determine that such warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." The Court notes that it is somewhat unclear from *Deorle* whether the absence of a warning is to be considered as a factor at all in cases where the force employed is unlikely to result in serious injury. But, regardless, there is no clearly established law cited by plaintiff or that Court is aware of that pushing a plaintiff to the ground in a marshy, wooded area is the type of force that may result in serious injury such that a warning should have been given under *Deorle*, or that the failure to give such a warning would necessarily render the force employed unreasonable under the facts of this case.

In *Blankenhorn v. City of Orange*, 485 F.3d 463, 478-79 (9th Cir. 2007), the Court concluded that the officers' use of force, which involved gang-tackling a non-violent suspect where the only alleged crime was misdemeanor trespass, was excessive in part because they "never tried to handcuff [the plaintiff] ... before [they] gang-tackled him." However, the instant case is factually distinguishable from *Blankenhorn* in that plaintiff

---

[5] The Court notes that the *Graham* factors overall appear to weigh in favor of the reasonableness of defendant Perez's actions. However, even if issues of fact remain with respect to whether plaintiff's constitutional rights were violated, defendants are entitled to qualified immunity under the clearly established law prong of the analysis.

1  was not "gang-tackled" but was pushed to the ground by a single officer, the alleged

2  crime was second degree burglary (a felony) rather than a misdemeanor, the officer

3  here believed plaintiff was fleeing from police, and there is evidence defendant was

4  concerned that plaintiff might have a weapon or sharp objects.

5      Plaintiff fails to identify any analogous cases to support a finding that defendant

6  Perez's actions violated a clearly established right.

7      Accordingly, the Court should find defendant Perez is entitled to qualified

8  immunity, and summary judgment, on plaintiff's claims with respect to the initial

9  takedown of plaintiff to the ground as plaintiff fails to show that defendant Perez's

10  actions violated a clearly established right. Thus, those claims should be dismissed.[6]

11          b)    Closed-Fist Strikes and Knee Strikes

12      The Court next analyzes defendant Perez's use of force after plaintiff was on the

13  ground. Specifically, the Court considers the video evidence of what appear to be three

14  closed-fist strikes and three knee strikes that defendant Perez employed to the right

15  side of plaintiff's body.

16      Here, the evidence shows that the type and amount of force used appears to

17  consist of three closed-fist strikes or punches and three knee strikes, all to plaintiff's

18  upper right anatomy. Construing the evidence in the light most favorable to plaintiff, a

19  reasonable jury could conclude that at least some of the closed-fist strikes landed in the

20  area of plaintiff's head and at least some of the knee strikes landed in the area of his

21  neck and back/spine. "[K]icks and punches to the head are often treated as intermediate

22

23  _____

24  [6] The Court notes that plaintiff's amended complaint seeks only money damages not injunctive or declaratory relief.

25

or significant force that, 'while less severe than deadly force, nonetheless presents a

significant intrusion upon an individual's liberty interests.'" *Mackay v. City of Salinas*, No.

19-CV-02257-EJD, 2022 WL 2802981, at *8 (N.D. Cal. July 18, 2022) (quoting *Gordon*

*v. City & Cnty. of San Francisco*, No. 20-CV-03910-JCS, 2021 WL 5449074, at *9 (N.D.

Cal. Nov. 22, 2021)); *see also, e.g., Tuuamalemalo v. Las Vegas Metro. Police Dep't*,

2018 WL 11016234, at *6 (D. Nev. Mar. 27, 2018) ("So, at most, [defendant's] punch

was intermediate force"); *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1147 (E.D.

Cal. 2016) ("Generally, impact blows by punching or kicking are considered 'significant

force.'"); *Coles*, 704 F.3d at 628 (kicking and baton blows to the plaintiff before he was

handcuffed involved "intermediate force" that presented "a significant intrusion").

With respect to the severity of injuries, defendants present evidence that plaintiff

complained of pain in his left leg after he was apprehended but that plaintiff also

acknowledged that he "already had a fracture from about a week ago." The evidence

shows that plaintiff also stated to Officer Powers that the scratches on his face were

"from the last 20 feet of sticker bushes."

The evidence shows that plaintiff reported ankle pain and left mid leg pain at the

emergency room but also shows that plaintiff was seen in the emergency room eight

days prior to his arrest after being struck by a car and sustaining a midshaft fibular

fracture. The emergency room records reflect that plaintiff had abrasions all over his

body from running through bushes, but no lacerations required repair at the emergency

room on November 28, 2020. *Id.*

The emergency room records reflect that plaintiff reported a "mild headache" and

was evaluated for a possible closed head injury and given a CT scan of his head and

cervical spine on November 28, 2020, in the emergency room. The CT scan of plaintiff's head showed no evidence of fracture or calvarial defect and the impression was a "normal head CT." The CT scan of plaintiff's cervical spine from the same day reflects an impression of "[n]o acute cervical spine abnormalities." The records from Snohomish County Jail reflect that plaintiff reported during his jail intake interview on November 28, 2020, that his leg was broken from "a week or so ago."

Plaintiff presents evidence in the form of his own declarations stating that he was punched in the head causing him to fall unconscious and that the strikes to his head caused him to suffer problems with the vision in his right eye. He also states the knee strikes to his neck and back/spine caused him to have ongoing "unbearable" pain. Plaintiff also states that this incident caused him to break his leg, although it is somewhat unclear how he alleges this injury occurred, nor does he address the fact that medical records reflect he had broken his leg eight days prior to the incident.

However, construing the facts in the light most favorable to plaintiff, a reasonable jury could review the evidence and find that plaintiff was struck in the head while he was on the ground by defendant Perez hard enough to lose consciousness and to cause plaintiff to suffer problems with the vision in his right eye, he was struck on his neck and back/spine severely enough to cause him to have ongoing significant pain, and at some point during the incident he may have reinjured or exacerbated a broken leg. Thus, the Court concludes that there are genuine issues of material fact regarding the type and amount of force employed (punches and knee strikes) and these may fall in the categories of intermediate to significant.

1    With respect to the severity of the crime at issue, the same analysis applies here

2    as above in addressing the initial takedown to the ground. The crime of second-degree

3    burglary —especially what defendant Perez knew of it — would likely fall farther on the

4    spectrum toward severe than, for instance, misdemeanor trespass, although it clearly

5    does not reach the highest level of severity. Thus, this factor weighs slightly in favor of

6    defendant Perez.

7    With respect to whether the suspect poses an immediate threat to the safety of

8    the officers or others, defendant Perez presents evidence that while plaintiff was on his

9    stomach on the ground he stuck both of his hands into his waistband underneath his

10    body, refused to comply with directives to show his hands, and actively resisted

11    defendant Perez's attempts to pull plaintiff's arms out from under him. He states that

12    because he knew plaintiff had just broken into a vehicle, attempted to burglarize a shop,

13    and was fleeing from a peace officer, he was concerned plaintiff may have been

14    carrying sharp objects or other weapons. Defendant Perez states that based on his

15    training and experience, subjects committing these types of crimes (i.e. burglary)

16    typically carry sharp objects, guns, and knives. He states that for his own and plaintiff's

17    safety, consistent with his training and experience, he delivered closed hand

18    compliance strikes to plaintiff's right flank and upper right arm area to gain control of

19    plaintiff's arms to ensure plaintiff had no access to potential weapons. He states that

20    these types of compliance strikes are designed to cause temporary pain while

21    minimizing the risk of lasting injury. Defendant Perez states that he then felt plaintiff's

22    right arm loosen and was able to gain control of plaintiff's right arm, placing it behind his

23    back.

24

25

1    Defendant Perez states that plaintiff continued to resist him by keeping his left

2 arm stuck in his waistband under his stomach. He states that using both of his hands to

3 secure plaintiff's right arm behind plaintiff's back, consistent with his training and

4 experience, he then delivered knee strikes to the plaintiff's upper right arm area to gain

5 compliance and control of plaintiff's left arm. He states that knee strikes in this manner

6 are also designed to cause temporary pain to gain compliance but not lasting injury. He

7 states that plaintiff ceased resisting after several knee strikes, and he was able to gain

8 control of plaintiff's left arm so his hands could be cuffed behind his back. He states that

9 as soon as he had plaintiff's hands secured, he ceased the use of all compliance

10 strikes.

11    Construing plaintiff's evidence liberally, the Court understands plaintiff to be

12 saying that that he was not moving or resisting when he was on the ground and that he

13 was a "helpless victim" when he was struck. Plaintiff also states that defendant Perez's

14 punches to the area of his head while he was on the ground rendered him unconscious

15 and despite this fact defendant Perez proceeded to knee him in the area of his neck and

16 back/spine.

17    The video evidence does not definitively refute plaintiff's assertion that he was

18 not resisting when he was on the ground, that at least some of the fist strikes landed in

19 the area of his head and caused him to fall unconscious, or that he was unconscious

20 when defendant Perez continued to knee him in the neck and back/spine.[7] The video

21

22

23

24

---

[7] The Court notes that plaintiff states elsewhere that he was a handcuffed when defendant Perez struck him. The video evidence does definitively refute plaintiff's assertion that he was handcuffed when defendant Perez struck him with his fist and knee as it shows plaintiff was not handcuffed until after defendant Perez stopped striking him.

25

does appear to show plaintiff get to his feet with the assistance of officers after he was

handcuffed. But this does not rebut plaintiff's statement that he lost consciousness

when he was on the ground.[8]

Thus, viewing the facts in the light most favorable to plaintiff, there exists a

genuine issue of material fact for a jury as to whether plaintiff posed an "immediate

threat" to defendant Perez when he employed the three closed-fist punches and three

knee strikes.

With respect to whether plaintiff was actively resisting arrest or attempting to

evade arrest, as discussed above, the evidence shows defendant Perez was told

plaintiff was initially fleeing from law enforcement. However, once plaintiff was on the

ground, viewing the evidence in the light most favorable to plaintiff, he was no longer

fleeing and was not actively resisting arrest and, during at least some of the use of force

employed during this stage, plaintiff was unconscious. Thus, there is a genuine issue of

material fact as to whether and during what points in time plaintiff may or may not have

been actively resisting arrest.

With respect to whether warnings were given, defendant Perez states he

instructed plaintiff to show him his hands but that plaintiff failed to comply and actively

resisted defendant Perez's attempts to pull his hands out from under plaintiff's body.

Plaintiff does not appear to directly address defendant Perez's claim that he instructed

---

[8] The Court notes that defendant argues that the request for admission included in the first round of discovery requests that "the drone recording of your arrest does not reflect that you lost consciousness after being apprehended after fleeing law enforcement" should be deemed admitted by plaintiff because he failed to respond. However, even if this fact were deemed admitted, it does not refute plaintiff's statement that he lost consciousness when he was on the ground as the video does not definitively show whether plaintiff was conscious or unconscious when he was on the ground.

REPORT AND RECOMMENDATION - 28

plaintiff to show his hands. However, viewing the evidence in the light most favorable to plaintiff, he was not resisting --- which the Court takes to mean he was not intentionally pinning his arms under his body or resisting defendant Perez's attempts to gain control of plaintiff's hands or pull his arms out from under plaintiff's body. Furthermore, viewing the evidence in the light most favorable to plaintiff, during at least some of the use of force employed at this stage, plaintiff may have been semi-conscious or unconscious and, therefore, would not have been actively resisting, and was possibly unable to comply with any verbal directives. Thus, even if a warning was issued, there is a genuine issue of material fact as to whether plaintiff actively resisted as defendant Perez claims, or, whether during some period plaintiff was unconscious and incapable of complying with verbal directives.

With respect to whether less intrusive alternatives were available; construing the evidence in the light most favorable to plaintiff, he was not resisting defendant's attempts to handcuff him and, may have been semi-conscious or unconscious during at least some of the incident. Viewing the evidence in the light most favorable to plaintiff, defendant potentially could have taken plaintiff's hands and handcuffed him without employing any fist or knee strikes. Thus, there is a genuine issue of material fact as to this factor as well.

Accordingly, with respect to the evidence, including the video, of apparent closed-fist and knee strikes the Court cannot conclude that no reasonable jury could find that that the force used by defendant Perez was unreasonable or excessive. Genuine issues of material fact preclude summary judgment with respect to whether plaintiff's constitutional rights were violated.

1    The Court also finds that, construing the evidence in the light most favorable to

2    plaintiff, clearly established law would have placed any reasonable police officer on

3    notice that their actions violated plaintiff's Fourth Amendment rights.

4    Several courts have concluded that impact strikes on a non-resisting person

5    constitute excessive force. In *Blankenhorn*, the officers had punched the plaintiff several

6    times while he was on the ground because they were "trying to get [the plaintiff's] arms

7    out from underneath him and secure the handcuffs." *Blankenhorn*, 485 F.3d at 480-81.

8    The officer testified that such punches are "utilized at times to distract an individual so

9    that his muscles relax momentarily and then you are able to take control." *Id.*

10   However, the plaintiff in *Blankenhorn* claimed he did not pin his arms underneath

11   his body. *Id.* Construing the evidence in the light most favorable to the plaintiff, the Ninth

12   Circuit concluded that "a rational jury could find that if [the plaintiff] did not maneuver his

13   arms beneath his body it eliminated the need for any use of force to release them, and

14   thus [the defendant's] punches were not reasonably justified by the circumstances as he

15   claims." *Id.* The Court further found that the plaintiff was not entitled to qualified

16   immunity stating that,

> In assessing the state of the law at the time of Blankenhorn's arrest, we need
> look no further than *Graham*'s holding that force is only justified when there is a
> need for force. We conclude that this clear principle … adequately put a
> reasonable officer on notice that punching [plaintiff] to free his arms when, in fact,
> he was not manipulating his arms in an attempt to avoid being handcuffed, was
> also a Fourth Amendment violation.

*Id.*

21   In *Branscum v. San Ramon Police Dep't*, 606 F. App'x 860, 863 (9th Cir. 2015)

22   plaintiff fled police in a high-speed chase, nearly hitting several officers with his van and

23   endangering the public in various ways. *Id.* After colliding with a pole, plaintiff got out of

24   the van and, as ordered, lay on the ground. *Id.* Officers submitted evidence that plaintiff

25

REPORT AND RECOMMENDATION - 30

1  resisted when officers attempted to place handcuffs on him leading to an escalating use

2  of force including closed-fist strikes and taser applications. *Id.* The district court denied

3  qualified immunity concluding that the video footage created genuine disputes regarding

4  whether plaintiff resisted at all, and, if so, to what extent he resisted, and whether he

5  started the struggle or was pulled up by an officer. *Id.* In upholding the district court's

6  denial of qualified immunity, the Court determined that "if the jury concluded that no acts

7  of resistance occurred, the officers' use of force would not be 'reasonably justified by

8  the circumstances as [they] claim.'" *Id.* (internal citations omitted).

9      Other district courts have also denied qualified immunity at the summary

10  judgment stage under similar circumstances to those presented here. *See, e.g., Paulino*

11  *v. Cruz*, No. 16-CV-02642-NC, 2017 WL 2903172, at *5 (N.D. Cal. July 7, 2017) ("At the

12  time of [plaintiff's] arrest, it was clearly established that the degree of force used by the

13  officers [tackling, kneeling, and striking] would be excessive if [plaintiff] was unresisting

14  and nonviolent."); *Turner v. Graff*, No. C 10-5709 CRB PR, 2012 WL 3656492, at *4

15  (N.D. Cal. Aug. 17, 2012) ("Although plaintiff's resistance created a need for defendants

16  to apply reasonable force to control him in order to maintain discipline and order,

17  kicking, punching and kneeing plaintiff after he was taken down and was face down on

18  the ground supports the finding that the force used by defendants was unreasonably

19  excessive or brutal, even if plaintiff did not suffer significant injuries."); *see also,*

20  *Mackay*, 2022 WL 2802981, at *11 (denying qualified immunity where, construing the

21  evidence in the light most favorable to plaintiff, defendant officers "punched and kicked

22  him while he was on the ground and not resisting or fighting back.").

23

24

25

1      Accordingly, the Court should hold that the law was "clearly established" as of

2  November 28, 2020, when the events of this case occurred, such that any reasonable

3  police officer would have been on notice they would be violating plaintiff's Fourth

4  Amendment rights by punching and kneeing him while he was on the ground not

5  resisting. Accordingly, defendant Perez should not be entitled to qualified immunity with

6  respect to the punching and kneeing of plaintiff while he was on the ground.

7  Defendant's motion for summary judgment should be denied with respect to plaintiff's

8  claims related to defendant Perez's punching and kneeing of plaintiff while he was on

9  the ground.

10  B.     Motion to Dismiss Pursuant to FRCP 37(d) and LCR 11(c)

11      Defendant also argues that, alternatively, the action should be dismissed

12  pursuant to FRCP 37(d) and LCR 11(c) due to plaintiff's failure to participate in

13  discovery. Dkt. 71 at 16-21.

14      Defendant presents evidence that defense counsel served plaintiff with discovery

15  materials marked "DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION TO

16  PLAINTIFF" and "DEFENDANT'S FIRST SET OF INTERROGATORIES AND

17  REQUESTS FOR PRODUCTION TO PLAINTIFF" ON November 22, 2022, at the

18  address filed with the Court. Dkt. 73. Defense counsel states that to date he has not

19  received a reply to those discovery requests. *Id.*

20      Defendant's counsel indicates he attempted to communicate about discovery

21  with plaintiff via letter on three occasions, with the first letter being sent as an

22  attachment to the Defendant's First Set of Requests for Admission/Production on

23  November 22, 2022. Dkt. 73, Ex. F. That letter, which counsel indicates was sent to the

24

25

REPORT AND RECOMMENDATION - 32

address plaintiff had on file with the court, explained that plaintiff had 30 days to respond to the discovery requests, and that defense counsel sought to take plaintiff's deposition before the discovery cutoff of January 12, 2023. *Id.* The letter states that counsel intends to take the deposition remotely via Zoom and asks that plaintiff advise when he is available for a remote/virtual deposition the week of December 26, 2022, or the week of January 5, 2023. *Id.* Defendant's counsel states he received no reply to this letter in any form. *Id.*

Defense counsel states that a second letter was mailed to plaintiff on December 16, 2022, explaining that defendant was newly co-represented by the undersigned attorney, and that defense counsel still sought to take the plaintiff's deposition prior to the discovery cutoff on January 12, 2023. *Id.*, Ex. G. The letter again states that counsel intends to take plaintiff's deposition remotely via Zoom and asks that plaintiff advise when he is available for a remote/virtual deposition the week of December 26, 2022, or the week of January 5, 2023. *Id.* Again, defendant's counsel states he received no reply to this communication. *Id.*

Defense counsel states that a third letter was mailed to plaintiff on January 9, 2023, containing a copy of the trial scheduling order of this Court and reminding plaintiff of the discovery cutoff date of January 12, 2023. *Id.*, Ex. H. The letter also stated that plaintiff had failed to participate in discovery in any way, and that his responses to discovery requests were 13 days overdue as of the date of that letter. *Id.* It also requested that the plaintiff participate in discovery before the January 12, 2023, cutoff, if he intended to do so and further reminded plaintiff of the dispositive motions filing deadline of February 13. *Id.* Defendant's counsel states that to date he has still not

received any communication from plaintiff regarding discovery, or in fact, any communication at all. *Id.*

In his response to defendant's motion, plaintiff appears to indicate that he was under the impression that he should not respond directly to the defendant but should only file through the courts. Dkt. 79. The Court notes that it appears from the docket that plaintiff attempted to file something related to defendant's discovery requests with the Court on December 27, 2022, but that these documents were returned as improperly filed with the Court pursuant to Local Rule (LCR) 5(d). *See* LCR 5(d) ("discovery requests and responses must not be filed unless they are used in the proceedings or the court orders filing.").

The Court also notes that plaintiff filed a document titled "motion requesting a time freeze or extension [sic]" which was dated January 31, 2023, and filed with the Court on February 3, 2023. Dkt. 70. In that document plaintiff indicates that he had been incarcerated at the Snohomish County Jail for the past 60 days with "no means or way to accurately continue my case[.]" *Id.* He notes there is no law library, law books or law computer and that there is no way for him to do zoom video calls of any nature. *Id.*

Federal Rule of Civil Procedure 37(d)(1)(A) provides that, on motion, a court "may order sanctions if (i) a party ... fails, after being served with proper notice, to appear for that person's deposition; or (ii) a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34 fails to serve its answers, objections, or written response." FRCP 37(d)(1)(A). A motion for sanctions for failing to answer or respond must include a certification that the movant has in good faith conferred or attempted to confer with the party failing to act in an effort to obtain

the answer or response without court action. FRCP 37(d)(1)(b). Sanctions may include

dismissing the action in whole or in part. FRCP 37(d)(3), 37(b)(2)(A). Dismissal is

authorized only in "extreme circumstances" where the violation is "due to willfulness,

bad faith, or fault of the party." *United States v. Kahaluu Const.,* 857 F.2d 600, 603 (9th

Cir.1988). Willfulness, bad faith, or fault is sufficiently demonstrated by "disobedient

conduct not shown to be outside the control of the litigants." *Hyde & Drath v. Baker*, 24

F.3d 1162, 1167 (9th Cir.1994).

LCR 37(a)(1) provides, in relevant part that if a *pro se* party "willfully refused to

confer, failed to confer in good faith, or failed to respond on a timely basis to a request

to confer, the court may take action as stated in CR 11 of these rules." LCR 11(c)

provides, in relevant part, that a party who "without just cause fails to comply with any of

the Federal Rules of Civil or Criminal Procedure, [the local rules] or an order of the

court" or who "obstructs the proceedings in a case may, in addition to or in lieu of the

sanctions or penalties provided elsewhere in these rules, be required by the court to

satisfy personally such excess costs and may be subject to such other sanctions as the

court may deem appropriate."

The Court first notes that it is questionable whether defendant's counsel has

adequately complied with the certification requirement under FRCP 37(d)(1)(b) in that

he does not appear to certify that he has in good faith conferred or attempted to confer

with plaintiff to obtain the answer or response without court action. It is also unclear

whether a deposition was ever properly noticed under FRCP 30(b)(1). *See* FRCP

30(b)(1) ("A party who wants to depose a person by oral questions must give

1  reasonable written notice to every other party. The notice must state the time and place

2  of the deposition and, if known, the deponent's name and address.")

3      It also does not appear that defendant sought leave of the Court to conduct a

4  deposition after becoming aware plaintiff had been incarcerated during the period when

5  several of their letters seeking to depose plaintiff were sent. *See* FRCP 30(a)(2)(B). Nor

6  does it appear defendants ever sought to compel plaintiff to appear for a deposition.

7      Furthermore, the record does not support a finding that plaintiff's failure to appear

8  for a deposition or to provide responses to interrogatories and requests for production is

9  due to willfulness, bad faith, or fault. Nor does it show that plaintiff willfully refused to

10  confer, failed to confer in good faith, or failed to respond on a timely basis to a request

11  to confer, or without just cause failed to comply with any of the Federal Rules of Civil

12  Procedure or Local Rules, or obstructed the proceedings. Rather, the records show that

13  plaintiff, who is proceeding *pro se*, attempted to file some sort of response to

14  defendant's discovery requests in December 2022, but that he attempted to improperly

15  file that response with the Court. The record also shows that on January 31, 2023,

16  plaintiff indicated he was incarcerated at a new address during the period when at least

17  two of defendant's letters were sent to a previous address. Dkt. 70. Therefore, although

18  the Court does not fault defense counsel for being unaware of plaintiff's new address

19  which had not yet been updated, it is unclear whether plaintiff actually received any of

20  defendant's letters in a timely fashion. A meet-and-confer, as required by FRCP

21  37(d)(1)(b), would have helped both parties address the difficulties with discovery.

22      Furthermore, in a document filed with the Court dated January 31, 2023, shortly

23  after the discovery deadline expired, which plaintiff captioned as a motion for extension,

24

25

REPORT AND RECOMMENDATION - 36

plaintiff appears to in part respond to defense counsel's letters. Specifically, plaintiff

indicates that he had been incarcerated and was unable to appear by "Zoom" – this

appears to at least potentially be a response to defendant's request to conduct a

deposition via Zoom. Dkt. 70.[9]

Under the circumstances, even assuming for purposes of this analysis that the

deposition was properly noticed and there was a proper certification under FRCP

37(d)(1)(b), plaintiff's actions with respect to defendant's discovery requests do not

warrant the severe sanction of dismissal.[10] Accordingly, the Court should deny

defendant's request for dismissal under FRCP 37(d) and LCR 11(c).

<u>IN FORMA PAUPERIS STATUS ON APPEAL</u>

The Court must also decide whether plaintiff's *in forma pauperis* status should

continue on appeal. *See* 28 U.S.C. §1915(a)(3) ("an appeal may not be taken *in forma*

*pauperis* if the trial court certifies in writing that it is not taken in good faith"). The Court

must determine whether appeal is frivolous or malicious, or whether it fails to state a

claim on which relief may be granted. *See* 28 U.S.C. §1915(e)(2)(B)(i)&(ii).

While the Court was not persuaded on the merits of all of plaintiff's claims, there

is no evidence that his appeal would be frivolous or is taken in bad faith. Accordingly,

the Court recommends that *in forma pauperis* status should continue on appeal.

---

[9] The Court notes that at the time of plaintiff's motion it was not clear to the Court that plaintiff may be attempting to respond to defense counsel's letters attempting to schedule a deposition. Dkt. 77. Accordingly, the Court viewed the motion as a request to extend the dispositive motion deadline and granted that request. *Id.*

[10] The Court notes that defendants do not appear to seek any other sanction, nor do they seek to re-open or compel discovery.

CONCLUSION

Based on the foregoing discussion, the undersigned recommends the Court GRANT IN PART and DENY IN PART defendant's motion for summary judgment (Dkt. 71) and DENY defendant's motion for dismissal under FRCP 37(d) and LCR 11(c) (Dkt. 71).

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on **October 20, 2023**, as noted in the caption."

Dated this 27th day of September, 2023.

*Theresa L. Fricke*
Theresa L. Fricke
United States Magistrate Judge